## DISTRICT COURT OF THE VIRGIN ISLANDS
## DIVISION OF ST. CROIX

GREAT LAKES INSURANCE S.E. and )
HDI GLOBAL SPECIALTY S.E., )
                         )
         Plaintiffs/Counter-Defendants, )
                         )
         v. )            **Civil Action No. 2019-0039**
                         )
SUNSHINE SHOPPING CENTER, INC. d/b/a )
SUNSHINE MALL, )
                         )
         Defendant/Counter-Plaintiff. )
_____)
                         )
CERTAIN UNDERWRITERS AT LLOYD'S, )
LONDON subscribing to POLICY NOS. )
B1230GP00647B17 and B1230GP00647C17, )
                         )
         Plaintiffs/Counter-Defendants, )
                         )
         v. )            **Civil Action No. 2020-0033**
                         )
SUNSHINE SHOPPING CENTER, INC. d/b/a )
SUNSHINE MALL, )
                         )
         Defendant/Counter-Plaintiff. )
_____)

**Attorneys:**
**Chad C. Messier, Esq.,**
**Charlotte K. Perrell, Esq.,**
St. Thomas, U.S.V.I.
**Daniel G. Sanders, Esq.,**
Chadds Fords, PA
     *For Plaintiffs/Counter-Defendants Great Lakes Insurance S.E. and HDI Global Specialty S.E.*

**Neal R. Novak, Esq.,**
Chicago, IL
     *For Plaintiffs/Counter-Defendants Certain Underwriters at Lloyd's, London subscribing to Policy Numbers B1230GP00647B17 and B1230GP00647C17*

**Nathan Mirocha, Esq.,**
Christiansted, U.S.V.I.
**Barry Michael Clark, Esq.,**
**Stuart Sobel, Esq.,**
Coral Gables, FL
     *For Defendant/Counter-Plaintiff Sunshine Shopping Center, Inc.*

## <u>MEMORANDUM OPINION</u>

**Lewis, District Judge**

THIS MATTER comes before the Court on Plaintiffs Great Lakes Insurance S.E. ("Great Lakes") and HDI Global Specialty S.E.'s ("HDI"), and Plaintiffs Certain Underwriters at Lloyd's, London subscribing to Policy Numbers B1230GP00647B17 and B1230GP00647C17's ("Underwriters," collectively with Great Lakes and HDI, "Plaintiffs") "*Daubert* Motion[s] to Exclude Reports, Opinions and Testimony of Defendant's Expert Amy Peevey" ("*Daubert* Motions") (19-cv-00039, Dkt. No. 238 (Great Lakes/HDI); 20-cv-00033, Dkt. No. 113 (Underwriters)); Plaintiffs' "Memorandum[s] of Law in Support of the *Daubert* Motions" (19-cv-00039, Dkt. No. 239; 20-cv-00033, Dkt. No. 114); Defendant Sunshine Shopping Center, Inc.'s ("Sunshine" or "Defendant") Responses (19-cv-00039, Dkt. No. 243; 20-cv-00033, Dkt. No. 116); Plaintiffs' Replies (19-cv-00039, Dkt. No. 254; 20-cv-00033, Dkt. No. 131); Plaintiffs' Supplemental Briefs (19-cv-00039, Dkt. No. 276; 20-cv-00033, Dkt. No. 149); Defendant's Responses to Plaintiffs' Supplemental Briefs (19-cv-00039, Dkt. No. 278; 20-cv-00033, Dkt. No. 151); and Plaintiffs' "Supplemental Brief[s] to Plaintiffs' *Daubert* Motion to Exclude Reports, Opinions, and Testimony of Defendant's Expert Amy Peevey Regarding Recently Produced Information" (19-cv-00039, Dkt. No. 279; 20-cv-00033, Dkt. No. 152). An evidentiary hearing was held on April 14, 2022. (19-cv-00039, Dkt. No. 281; 20-cv-00033, Dkt. No. 155).

For the reasons that follow, the Court will grant Plaintiffs' *Daubert* Motions and exclude the testimony of Defendant's proposed expert witness.

# I.   BACKGROUND

## A.  Factual Background

When Hurricane Maria struck the United States Virgin Islands on September 19-20, 2017, Defendant Sunshine had commercial property insurance for its mall—the Sunshine Shopping Center in Frederiksted, St. Croix (the "Mall")—with Plaintiffs Great Lakes, HDI, and Underwriters. After the hurricane, Sunshine sought insurance coverage in the amount of $12,060,933.60 from Plaintiffs. (19-cv-00039, Dkt. No. 1 (Compl.) at ¶ 7; 20-cv-00033, Dkt. No. 1 (Compl.) at ¶ 9). After ensuing negotiations between the parties proved fruitless, Great Lakes and HDI filed a joint lawsuit in August 2019, in which they seek declaratory relief under the Federal Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202, and Federal Rule of Civil Procedure 57—namely, determinations of the parties' rights and obligations for their respective insurance contracts with Sunshine (the "Great Lakes and HDI Policies"). (19-cv-00039, Dkt. No. 1 (Compl.) at ¶1). They were followed in turn by Underwriters, who filed suit in July 2020 seeking the same relief with respect to Lloyd's, London's two policies with Sunshine ("Lloyd's Primary and Excess Policies"). (20-cv-00033, Dkt. No. 1 (Compl.) at ¶ 1).

The Great Lakes and HDI Policies are substantially similar: Each covers the Mall for "all risks of direct physical loss or damage" up to a limit of $18.2 million, with a sub-limit of $3.25 million on losses caused by "any one occurrence in respect of Windstorm after deductible." (19-cv-00039, Dkt. No. 1 (Compl.) at ¶ 22). Lloyd's two policies are structured slightly differently: Lloyd's Primary Policy covers the Mall for "all risks of direct physical loss or damage" up to a limit of $3.25 million for "any one occurrence including Windstorm after deductible," while Lloyd's Excess Policy provides an additional $14.95 million in coverage for "any one occurrence [in] excess" of $3.25 million but "excludes coverage for loss or damage due to windstorm." (19-cv-00039, Dkt. No. 1 (Compl.) at ¶¶ 22-23).

3

In support of its claims of over twelve million dollars, Sunshine contends that the damage the Mall sustained on September 19-20, 2017 "resulted from the combination of vandalism (the breach of an overhead roll-up door) and Hurricane Maria, together." (Dkt. No. 243 (Def. Resp.) at 2).[1] Sunshine argues that both the hurricane and the vandalism were "substantial contributing factor[s] in causing the damage [and] neither would have, by itself, caused the extensive damage." *Id.* at 2-3. Accordingly, Sunshine maintains that the sublimits on the Great Lakes and HDI Policies, which apply to windstorms but not vandalism, are inapplicable. *Id.*  Sunshine further maintains that Lloyd's Excess Policy, which excludes coverage for damage due to windstorms but not vandalism, is applicable. *Id.* Plaintiffs disagree, arguing, in the case of Great Lakes and HDI, that the sublimit applies, and, in the case of Underwriters, that the excess coverage is inapplicable.

To aid in resolving this dispute, Sunshine proffers the expert opinion and testimony of Amy Peevey ("Peevey"), a licensed professional engineer with over twenty years of experience in the "evaluation, design, and construction of new and existing buildings" (Dkt. No. 244-1 (Peevey First Aff.) at ¶¶ 3, 5). Plaintiffs' *Daubert* Motions seek to exclude Peevey's testimony on a variety of bases.

### B.  Peevey's Damage Causation Report

Peevey authored, and Sunshine timely served, a "Damage Causation Report" ("Report"), in which Peevey evaluates the reasons for the damage to the Mall's building envelope. (Dkt. Nos. 239-1 and 239-2).[2] As relevant here, this damage included a breach in an overhead door and a

---

[1] The parties have filed substantially similar motions and memoranda in both cases. (*See* Dkt. No. 242 (Pls.' Joint Notice of Coordination) at 4 ("The *Daubert* Motions, supporting Memoranda and exhibits in both the 039 Case and the 033 Case are identical and [Plaintiffs] inform the Defendant and the Court of this coordination to the extent this makes review of these Motions more efficient.")). The Court will cite to 19-cv-00039 (Great Lakes/HDI) unless otherwise noted.

[2] Defendant filed the Report in two parts at Dkt. Nos. 239-1 and 239-2. The Court will cite to the internal pagination of the Report, not the pagination appended by CM/ECF.

breach in a soffit (overhang), both on the Mall's East side, as well as the partial collapse of the Mall's East roof deck. *Id.* at 15-23.

In summary, Peevey finds that the breach to the overhead door "was present prior to [Hurricane Maria's] impact," *i.e.*, was the product of vandalism, and ultimately concludes that this breach to the overhead door was a "but-for" cause of the "roof deck failure and subsequent widespread interior damage." *Id.* at 4. According to Peevey, while the forces that the hurricane exerted on the Mall were insufficient to create enough "uplift" pressure to cause the roof deck to fail, the overhead door breach—in combination with the soffit breach—affected the "porosity" of the Mall such that the uplift pressure on the roof deck ultimately increased to a degree sufficient to cause the roof deck to fail. *Id.* Per Peevey, the failure of the roof deck led, in turn, to differential pressure within the Mall that "drove the wind, wind-borne debris, and rain" through the Mall's interior and caused "severe and widespread" interior damage. *Id.* On these grounds, Peevey ultimately opines: that the hurricane could not have caused the overhead door breach; that the vandalized overhead door breach was a but-for cause of the roof deck failure; and that the overhead door breach led to damage to the Mall that was more "severe and widespread" than it would have been absent the overhead door breach. *Id.*

### C. The Basics of Wind Pressure as Explained in Peevey's Report

Peevey explains in her Report that when wind strikes a structure it exerts a positive external pressure on the wall that it strikes, which is called the "windward" wall. *Id.* at 32. At the same time that wind exerts this positive pressure on the windward wall, it is simultaneously displaced over and around the structure to the opposite wall, called the "leeward" wall. *Id.* This displacement generates negative external pressure (*i.e.*, suction) on the leeward and side walls, as well as on the roof. *Id.*

In addition to these external pressures, wind also affects the internal pressure of a structure when it is forced—by positive external pressure—into the structure through any openings on the windward wall, as well as when it is pulled—by negative external pressure—out of the structure through any openings on the leeward wall, side walls, and roof. *Id*. at 32-33. When the amount of air infiltration through the windward wall exceeds the combined amount of air exfiltration through the leeward wall, side walls, and roof, more air will be forced into the structure than is pulled out, which leads the structure's internal pressure to tend positive or "pressurize." *Id.* Conversely, when the opposite is true—when the combined air exfiltration of the leeward wall, side walls, and roof exceeds that of the infiltration through the windward wall—more air will be pulled out of the structure than is forced into it, which leads the structure's internal pressure to tend negative or "depressurize." *Id.* at 32-34. The amount of air infiltration or exfiltration through a surface is a factor of that surface's "porosity" (*i.e.*, airtightness), and the porosity of a surface is largely determined by the number and size of any breaches on the surface. *Id.* at 33-34.

A force called "uplift" is created when the pressure below a roof is higher than the pressure above it. *Id.* at 32. By corollary, wind uplift will generally increase both when the internal pressure below a roof increases (which it will do when a structure pressurizes because the porosity of the windward wall exceeds that of the other surfaces) and when the external pressure above it decreases (which it will do when there is more air being displaced over the roof creating negative pressure). *Id.*

### D.  Key Components of Peevey's Methodology

Based on the Report, hearing testimony, and the parties' briefing, the Court understands Peevey's methodology as consisting fundamentally of five key components that are important to an overall understanding of the methodology and the Court's *Daubert* analysis.

First, Peevey's methodology includes a calculation of the "as-built capacity" of the roof deck and overhead door, which is the amount of force—measured in pounds per square foot ("psf")—that each could withstand given its components, materials, and construction. *Id.* at 35-40. Based on her review of these factors, Peevey determined that the as-built capacity of the roof deck was 121.6 psf—that is, that the roof could withstand anything up to -121.6 psf in uplift pressure— and that the as-built capacity of the overhead door was somewhere over 30 psf. *Id.*

Second, Peevey's methodology includes a determination of windspeed and wind direction at the Mall based on her extrapolation from given measurements. *Id.* at 12. In this regard, Peevey explains that the force that wind exerts upon a structure is partially a product of the wind's speed and the degree at which it makes contact with the structure. *Id.* at 11-12. Accordingly, to determine the amount of force with which Hurricane Maria impacted the Mall, Peevey first had to determine the windspeed and wind direction at the Mall, neither of which was a given measurement. *Id.* at 12. To determine these values, Peevey extrapolated from data that the National Oceanic and Atmospheric Administration ("NOAA") had collected during the hurricane at two locations: at the hurricane's eyewall; and at the Sandy Point National Wildlife Refuge, which is less than four miles from the Mall (collectively, the "NOAA data"). (Dkt. No. 244 (Peevey First Aff.) at ¶ 13).

To extrapolate the windspeed at the Mall from the NOAA data, Peevey assumed that hurricane windspeed varied inversely with radial distance from the hurricane's eye. (Dkt. No. 239-1 (Report) at 10).  In support of this assumption, Peevey relied on a paper published in 1999 by the American Meteorological Society for the proposition that "[h]urricane wind speeds have been shown to decrease linearly with radial distance from the storm eye." *See id.* (citing John Tuttle & Robert Gall, *A Single-Radar Technique for Estimating the Winds in Tropical Cyclones*, 80 Bull. of the Am. Meteorological Society 653, 658 (1999) (the "TREC Article")). In her deposition testimony, Peevey explained how this assumption functioned: "A linear relationship [means] that

if [the windspeed is] 175 miles per hour at the eyewall [then the windspeed is] going to be less than that at another point that's further way from the storm . . . because of that linear relationship"). (Dkt. No. 175 (Peevey Second. Dep. Tr. Excerpts) at 9:15-21). Based on this assumption, Peevey extrapolated from the NOAA data and the trajectory of the hurricane to conclude that windspeed at the Mall was greatest at 3:00 a.m. (AST), when the Mall experienced sustained winds of up to 97.98 mph and gusts as high as 131.05 mph. (Dkt. No. 239-1 (Report) at 11).

To establish the wind direction at the Mall, Peevey used trigonometry to extrapolate from the wind direction at the hurricane's eyewall. (Dkt. No. 244 (Peevey First Aff.) at ¶ 19). As Peevey explained at the evidentiary hearing, this process essentially consisted of drawing a tangent from the hurricane's eyewall to the Mall. (*See also* Dkt. No. 275-1 (Peevey Second Dep. Tr. Excerpts) at 10:9-23 (explaining process); Dkt. No. 244-3 (Ex. B to Peevey's First Aff.) at 1-8 (graphics showing tangents and direction of the wind at the Mall at various times)).

Third, Peevey's methodology includes calculations of the force that Hurricane Maria exerted on the Mall. *Id.* at 41-42. Utilizing her windspeed and wind direction extrapolations, Peevey calculated the force—specifically the uplift pressure—that Hurricane Maria exerted on the Mall under three different circumstances. *Id.* One calculation factored in that both the overhead door and soffit breaches affected the Mall's porosity; one factored in only the overhead door breach and its effect on the Mall's porosity; and one factored in neither the overhead door nor soffit breaches, nor their corresponding effects on the Mall's porosity. *Id.*

As both the overhead door and soffit breaches were to the Mall's East, windward wall, both breaches functioned to pressurize the building, and—therefore—to increase the uplift pressure on the Mall's roof. *Id.* at 42. Peevey's uplift calculations reflect as much. She calculated that, ignoring both breaches, the hurricane induced up to -98.9 psf of uplift pressure on the perimeter of the roof; that, accounting for only the overhead door breach, the hurricane induced up to -113.2 psf of uplift

pressure on the perimeter of the roof; and that, accounting for both breaches, the hurricane induced up to -124.3 psf of uplift pressure on the perimeter of the roof. *Id.* at 42-43.

Fourth, Peevey concluded that Hurricane Maria could not have caused the overhead door breach, and that the overhead door breach was a but-for cause of the roof-deck failure. Given that the only calculation in which the uplift pressure on the roof exceeded the 121.6 psf as-built capacity of the roof deck is that which accounts for *both* the overhead door and soffit breaches, Peevey's conclusion—that the overhead door breach was the but for cause of the roof deck failure—follows provided that the hurricane did not itself cause the overhead door breach in the first instance. This Peevey demonstrated by calculating—again based on her windspeed and wind direction extrapolations—that the pressure that the hurricane exerted on the overhead door did not exceed 28.1 psf, which is less than the overhead door's as-built capacity of ">30" psf. *Id.*

Fifth, Peevey concluded that the roof deck failure was a "substantial contributing factor" to much of the interior damage that the Mall sustained. *Id.* at 44-45. Peevey calculated the post-breach pressure surrounding the overhead door and soffit breaches, as well as the post-breach pressure surrounding the roof deck breach. *Id.* at 44. She found that the pressure around the overhead door and soffit breaches was "generally positive" (because the two breaches were windward) and that the pressure around the roof deck breach was "generally negative" (because the breach was not windward). *Id.* at 44. This differential pressure, Peevey concluded, created a "suction effect pulling the storm into the [Mall] from the breaches in the wall [*i.e.*, the overhead door and soffit breaches] up through the common areas and open atrium, and out the roof opening," which in turn "caused widespread damage throughout the interior of the [Mall]." *Id.* at 44-45. It follows that the overhead door breach—which was a but-for cause of the roof deck failure per above—also substantially contributed to much of the interior damage the Mall sustained.

9

## II.   APPLICABLE LEGAL PRINCIPLES

"Under the Federal Rules of Evidence, a trial judge acts as a 'gatekeeper' to ensure that 'any and all expert testimony or evidence is not only relevant, but also reliable.'" *Pineda v. Ford Motor Co.*, 520 F.3d 237, 243 (3d Cir. 2008) (quoting *Kannankeril v. Terminix Int'l, Inc.*, 128 F.3d 802, 806 (3d Cir. 1997) (citing *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993)). The Federal Rules of Evidence "embody a strong preference for admitting any evidence that may assist the trier of fact." *Id.*; *see also* Fed. R. Evid. 401 (defining "relevant evidence," which is generally admissible, as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."). In accordance with this prescription, Rule 702, which governs the admissibility of expert testimony, has a "liberal policy of admissibility." *Kannankeril*, 128 F.3d at 806. The rule provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702.

The Third Circuit has characterized the "three major requirements" of Rule 702 as: "(1) the proffered witness must be an expert, *i.e.*, must be qualified; (2) the expert must testify about matters requiring scientific, technical or other specialized knowledge; and (3) the expert's testimony must assist the trier of fact." *Pineda*, 520 F.3d at 244 (citing *Kannankeril*, 128 F.3d 802). The Third Circuit has labelled this three-part test, which must be satisfied for an expert to testify as: "qualifications, reliability and fit." *Schneider ex rel. Estate of Schneider v. Fried*, 320

F.3d 396, 404 (3d Cir. 2003). "[T]he party offering the expert must prove each of these requirements by a preponderance of the evidence." *Mahmood v. Narciso*, 549 F. App'x. 99, 102 (3d Cir. 2013) (citing *In re TMI Litig.*, 193 F.3d 613, 663 (3d Cir. 1999)).

### A. Qualifications

The Third Circuit has interpreted Rule 702's qualification requirement liberally. *Pineda*, 520 F.3d at 244.  "If the expert meets liberal minimum qualifications, then the level of the expert's expertise goes to credibility and weight, not admissibility." *Kannankeril,* 128 F.3d at 809. The Third Circuit has also held that it "is an abuse of discretion to exclude testimony simply because the trial court does not deem the proposed expert to be the best qualified or because the proposed expert does not have the specialization that the court considers most appropriate." *Id.* (citing *Holbrook v. Lykes Bros. S.S. Co.*, 80 F.3d 777, 782 (3d Cir. 1996)). Still, "[i]f the expert testimony falls outside a witness's expertise, the court should exclude it." *Ferris v. Pa. Fed'n Bhd. of Maint. of Way Emps.*, 153 F. Supp. 2d 736, 743 (E.D. Pa. 2001).

### B. Reliability

The Third Circuit has determined that "an expert's testimony is admissible so long as the process or technique the expert used in formulating the opinion is reliable." *Kannankeril*, 128 F.3d at 806. In other words, the expert's testimony "must be based on the methods and procedures of science rather than on 'subjective belief or unsupported speculation'; the expert must have 'good grounds' for his or her belief." *Schneider*, 320 F.3d at 404 (quoting *In re Paoli R.R. Yard PCB Litigation*, 35 F.3d 717, 742 (3d Cir. 1994) ("*Paoli II*")). Thus, "an inquiry into the reliability of scientific evidence under Rule 702 requires a determination as to its scientific validity." *Id; see also Heller v. Shaw Indus., Inc.*, 167 F.3d 146, 155 (3d Cir. 1999) ("The reliability analysis applies to all aspects of an expert's testimony: the methodology, the facts underlying the expert's opinion, [and] the link between the facts and the conclusion."). While the proponent of the evidence "has

to make more than a *prima facie* showing that his expert's methodology is reliable," the proponent does not have to show that the assessments of his expert are correct. *Pineda*, 520 F.3d at 247; *see also Paoli II*, 35 F.3d at 744 ("The evidentiary requirement of reliability is lower than the merits standard of correctness.").

The Third Circuit has highlighted at least eight factors that a court can consider in assessing whether a proffered expert's methodology is reliable:

> (1) whether a method consists of a testable hypothesis; (2) whether the method has been subjected to peer review; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; (5) whether the method is generally accepted; (6) the relationship of the technique to methods which have been established to be reliable; (7) the qualifications of the expert witness testifying based on the methodology; and (8) the non-judicial uses to which the method has been put.

*Id*. at 247-48 (citing *Paoli II*, 35 F.3d at 742 n.8). However, these "*Paoli II* Factors" are "neither exhaustive nor applicable in every case." *Kannakeril*, 128 F.3d at 806-07. District courts have "broad discretion in determining the admissibility of evidence, and 'considerable leeway' in determining the reliability of particular expert testimony under *Daubert*." *Simmons v. Ford Motor Co.*, 132 F. App'x 950, 952 (3d Cir. 2005) (citing *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152-53 (1999)).

**C. Fit**

At issue under the fit requirement is whether the expert's testimony will assist the trier of fact, which "goes primarily to relevance." *Daubert*, 509 U.S. at 591. As explained by the Third Circuit, "the expert's testimony must be relevant for the purposes of the case and must assist the trier of fact." *Schneider*, 320 F.3d at 404; see also *Daubert*, 509 U.S. at 591-92 ("Rule 702 . . . requires a valid scientific connection to the pertinent inquiry as a precondition to admissibility.") "Admissibility thus depends in part upon 'the proffered connection between the scientific research

12

or test to be presented and particular disputed factual issues in the cases.'" *Oddi v. Ford Motor Co.*, 234 F.3d 136, 145 (3d Cir. 2000) (quoting *Paoli II*, 35 F.3d at 743).

### III.   DISCUSSION

Plaintiffs argue that Peevey's testimony and ultimate opinions—that the overhead door was breached prior to the storm, that the breach was a but-for cause of the roof deck failure, and that the breach substantially compounded the damage Hurricane Maria inflicted upon the Mall— are inadmissible on four interlocking grounds.

First, Plaintiffs argue that Peevey is not qualified to extrapolate the windspeed and wind direction from the NOAA data to the Mall because she is not a meteorologist, lacks the engineering background and training to perform the relevant calculations, and had never calculated windspeed and wind direction prior to this project. (Dkt. No. 239 (Pls.' Memo.) at 3-6).

Second, Plaintiffs argue that Peevey's methodology is unreliable with respect to these extrapolations because Peevey is not qualified to calculate windspeed and wind direction, *id.*; the method she used to calculate windspeed and wind direction at the Mall is unsound for a variety of technical reasons, *id.* at 7-12; and her windspeed and wind direction extrapolations cannot be squared with historical meteorological data and physical evidence from the Mall, *id.* at 12-13.

Third, Plaintiffs argue that Peevey's methodology is unreliable with respect to her calculations of the force that the hurricane exerted on the Mall because these calculations rely on her "flawed" windspeed and wind direction extrapolations, *id.* at 13-14; because the methodology Peevey used to calculate the force and pressure is unsound for a variety of technical reasons, *id.* at 14-19; and because her force calculations cannot be squared with historical meteorological data and physical evidence from the Mall, *id.* at 19-21.

13

Fourth, Plaintiffs argue that Peevey has neglected to adequately explain various key elements of her methodology and the grounds upon which she arrived at her conclusions in either her Report or deposition and hearing testimony. *Id.* at 9-11, 14-19.

Defendant's response is twofold. First, Defendant argues that Peevey is qualified to make meteorological extrapolations by virtue of her engineering background. According to Defendant, "Peevey's incorporation of this [NOAA] data into her engineering models does not require a meteorological degree . . . Instead, the determination of the weather conditions at the Mall 'requires knowledge in the field of engineering modeling and simulation and relevant engineering knowledge.'" (Dkt. No. 243 (Def.'s Resp.) at 10 (quoting Dkt. No. 244 (Peevey First Aff.) at ¶ 17)). Second, Defendant argues that Plaintiffs' concerns with the reliability of Peevey's methodology are minor and go to the weight of Peevey's testimony, not its admissibility. *Id.*

The Court agrees that some of Plaintiffs' arguments are properly characterized as going to weight rather than admissibility. However, as detailed below, the Court finds that Peevey is not qualified to calculate windspeed or wind direction at the Mall and that her analysis is unreliable, thus rendering her testimony inadmissible. Accordingly, the Court will exclude Peevey's testimony in its entirety.

### A. Peevey's Qualifications to Calculate Windspeed and Wind Direction

While the Court recognizes that the qualifications requirement under *Daubert* is to be liberally construed, *see Pineda*, 520 F.3d at 244, the Court agrees with Plaintiffs that Peevey's background, education, and training do not qualify her to extrapolate windspeed and wind direction at the Mall from the NOAA data.

Peevey obtained a Bachelor of Science degree from the University of Texas and is a licensed professional engineer. (Dkt. No. 239-1 (Report) at 3). She has over twenty years of experience "in the evaluation, design, and construction of new and existing buildings," and

14

"extensive experience in the assessment, design, repair/restoration, and construction of condominium, commercial, mixed-use, educational, medical, and institutional facilities." *Id.* She provides "engineering consulting services," and "specializes in building envelopes." *Id.*

Notwithstanding her engineering background and prior work on similar projects, Peevey admitted at the evidentiary hearing and in her two depositions that she had never previously extrapolated windspeed and wind direction. (*See* Dkt. No. 239-3 (Peevey First Dep. Tr. Excerpts) at 21:2-7; Dkt. No. 275-1 (Peevey Second Dep. Tr. Excerpts) at 11:22-25, 13:4-8, 34:11-23); *see also* Dkt. No. 239-3 (Peevey First Dep. Tr. Excerpts) at 26:24-27:2 (classifying these extrapolations as "calculations")). Peevey explained that, for past projects, she and her team would rely on data provided by multiple weather stations in the vicinity of the project, and could "get twenty [weather] stations around one building," such that her team could simply use the "closest" and "most relevant readings" without needing to extrapolate. (Dkt. No. 239-3 (Peevey First Dep. Tr. Excerpts) at 19:24-20:11). However, Peevey explained that she was forced to extrapolate from existing data for this project because she did not have measurements from sources sufficiently close to the Mall, as she typically would for her projects in the continental United States. *Id.* at 20:12-21-1.

The mere fact that this is the first time that Peevey has undertaken such extrapolations of windspeed and wind direction is not by itself disqualifying. Indeed, the Court appreciates that every expert has a first time. However, such extrapolations by an engineer is, by all indications, an unparalleled departure from the norm that—as discussed further below—such extrapolations fall exclusively within the province of meteorologists.

As an initial matter, the Court observes that Peevey's approach on previous projects— merely utilizing existing weather data, rather than extrapolating from it—comports with the terms upon which courts have accepted similar expert testimony in the past. *See, e.g., Revocable Tr.*

*Agreement of Randall S. Ellis & Teri L. Ellis v. State Farm Fire & Cas. Co.*, No. 21-cv-00076, 2022 WL 2671845, at *11 (N.D. Okla. July 11, 2022) ("It is within the scope of a professional engineer's expertise, when determining damage causation (including hail and wind damage), to rely on weather reports confirming the presence of a severe storm at the residence."); *SFR Servs. LLC v. Elec. Ins. Co.,* No. 19-cv-02013, 2021 WL 1193284, at *20 (M.D. Fla. Mar. 30, 2021) (rejecting *Daubert* challenge to an engineer-expert's qualifications where party was "not seeking to tender [the expert] as an expert in forensic meteorology" and the expert's opinion to the damage that Hurricane Irma caused to a roof of the structure at issue was "predicated upon an existing wind-speed map that includes the location of the [] residence"); *Woodbury Lodging LLC v. Integrity Mut. Ins. Co.*, No. 20-cv-01015, 2022 WL 1004602, at *6 (D. Minn. Apr. 4, 2022) ("[I]t is permissible for an engineer to form an opinion relating to hail damage based on a [pre-existing] meteorologist report"); *TBC-JP-LR, JV v. Allied Prop. & Cas. Ins. Co.*, No. 17-cv-00131, 2018 WL 10562785, at *4 (N.D. Tex. Sept. 28, 2018) (rejecting *Daubert* challenge to an engineer-expert's qualifications where expert's opinion about hail damage to a roof was based, in relevant part, on pre-existing NOAA data).

However, the opposite is true when an engineer extrapolates from pre-existing weather data to create new data. In such circumstances, courts have held that engineers are not qualified to give expert testimony founded upon calculations that they performed that fall within the province of meteorologists. For example, in *Spring Street Apartments Waco, LLC v. Philadelphia Indemnity Insurance Company*, the district court held that the plaintiff's proffered expert, an engineer who had "no meteorological education or training" and lacked "the credentials and qualifications to be qualified as an expert in meteorology," was not qualified to testify that a meteorologist's windspeed calculations were correct. No. 16-cv-00315, 2017 WL 2805014, at *10-*13 (W.D. Tex. June 28, 2017). Similarly, in *Lewis-Smith Corporation v. Chattahoochee Bay Railroad*

*Incorporated*, the district court held that the plaintiff's proffered expert, "a civil engineer," was not qualified to testify to "the categorization of the rain event" that struck a property, where the expert based his opinions on calculations he made from a rainfall atlas, because "he is not an expert in meteorology and has only minimal training in meteorology[.]" No. 10-cv-00786, 2012 WL 1155249, at *1-*2 (M.D. Ala. Apr. 5, 2012). Also instructive is *Greater Hall Temple Church of God v. Southern Mutual Church Insurance Company*, in which the district court held that the plaintiff's proffered expert was not qualified to testify that wind from Hurricane Maria damaged the plaintiff's roof where "[t]he record [was] silent as to [the expert's] experience addressing wind velocity and diagnosing the cause of roof damage, which is at the heart of the testimony he [sought] to offer in th[e] case." No. 17-cv-00111, 2019 WL 4147589, at *5 (S.D. Ga. Aug. 30, 2019), *objections overruled*, No. 17-cv-00111, 2020 WL 1809747 (S.D. Ga. Jan. 13, 2020), *aff'd in part, rev'd in part on other grounds,* 820 F. App'x 915 (11th Cir. 2020).

Likewise, when rejecting *Daubert* challenges, courts have stressed that an engineer-expert did not create the weather on which he relied but rather relied on pre-existing data that was appropriately proximate to the property at issue. For example, in *Webster v. State Farm Casualty and Insurance Company*, the district court rejected the defendant's *Daubert* challenge to the qualifications of the plaintiff's engineer-expert who had concluded that wind and water from Hurricane Katrina had damaged the plaintiff's property, where the expert was "not [] offered as a meteorologist and "reviewed, but did not create" the "weather data" upon which he relied. No. 07-cv-04812, 2008 WL 2123753, at *3 (E.D. La. May 15, 2008); *see also, e.g., Newton v. State Farm Lloyds*, No. 21-cv-00322, 2022 WL 2196314, at *4 (E.D. Tex. Apr. 13, 2022) (same), *report and recommendation adopted*, No. 21-cv-00322, 2022 WL 2197138 (E.D. Tex. June 17, 2022).

While none of the foregoing cases constitute binding precedent, this Court nonetheless finds them instructive. Moreover, there are three additional considerations that counsel in favor of

adopting precisely the distinction that these courts have adopted—between the admissible testimony of engineers who simply utilize existing weather data in their analyses, and the inadmissible testimony of engineers who extrapolate from existing weather data to create new data.

First, the only cases of which the Court is aware in which courts have rejected *Daubert* challenges to engineer-experts who extrapolated from existing weather data to determine the cause of damage to a property are those in which the engineer was either dual-qualified as both an engineer and meteorologist or specifically certified as a windstorm engineer. *See, e.g., MCFS & BB, Inc. v. Hartford Ins. Co. of the SE.*, No. 21-cv-00254, 2022 WL 2818107, at *1, *4 (M.D. Fla. July 19, 2022) (rejecting *Daubert* challenge to proffered expert's qualifications where expert was "a meteorologist and engineer" with master's degrees in both atmospheric science and civil engineering, and where expert opined that wind and rain from storm caused property damage after he "compared the [property]'s location to the source of the weather data [a weather station at a nearby airport]" in order to "form[] an opinion about what weather events occurred at the [property]."); *State Auto. Mut. Ins. Co. v. Freehold Mgmt., Inc.*, No. 16-cv-02255, 2019 WL 1436659, at *13 (N.D. Tex. Mar. 31, 2019) (rejecting *Daubert* challenge to proffered expert's qualifications where expert was a "licensed engineer in nineteen states," was "certified by the Texas Department of Insurance as a Windstorm Engineer," and had "developed a curriculum and teaches classes regarding forensic wind and hail damage investigations to engineers," where expert opined that wind and rain from storm caused property damage after he "extrapolated [weather] data using a vacuum uplift test").

Second, the Court observes that, in analogous circumstances, courts have routinely recognized the distinction between meteorologists and engineers while cabining the testimony of meteorologists to their respective area of expertise. *See, e.g., Cameron Par. Sch. Bd. v. RSUI*

18

*Indem. Co.*, No. 06-cv-01970, 2008 WL 4965305, at *2 (W.D. La. Nov. 20, 2008) ("This Court finds that [the proffered meteorologist-expert] is qualified to testify as an expert in air modeling and forensic meteorology and that his methodology is reliable. [He] is, however, precluded from giving opinions on structural engineering issues [related to wind damage that property sustained during Hurricane Katrina] because he is not an engineer and therefore is not qualified under *Daubert*."); *Medical Plaza, LLC v. United States Fid. & Guar. Co.*, No. 07-cv-00098, 2008 WL 4539587, at *5 (S.D. Miss. Oct. 6, 2008) (precluding proffered meteorologist-expert from expressing opinions "on engineering matters he is not qualified to address"). Also relevant is the fact that at least some engineers appear to explicitly recognize the distinction between the two domains. *See, e.g., Warren v. Lloyds*, No. 19-cv-02777, 2020 WL 9457066, at *2 (S.D. Tex. Nov. 19, 2020) (concluding an engineer-expert's testimony as to whether Hurricane Harvey damaged a property's roof was inadmissible where the expert himself admitted that his analysis "required [additional] data from a meteorologist to be reliable" and "mentioned multiple times during his deposition that a meteorologist's analysis would be necessary to supplement his report and give a conclusive answer as to the cause of the [] roof damage.").

Third, the Court notes that the standard practice in cases such as this—where more meteorological analysis is required than merely utilizing pre-existing data from nearby sources— is for a party to proffer the expert testimony of both an engineer and a meteorologist. *See, e.g., Spansel v. State Farm Fire & Cas. Co.*, No. 08-cv-01516, 2010 WL 415264, at *2-*5 (S.D. Miss. Jan. 27, 2010) (rejecting *Daubert* challenges to experts' qualifications where meteorologist opined on wind conditions at a property during Hurricane Katrina by extrapolating from measurements at nearby airports, and engineer opined on whether those wind conditions could have caused the damage observed to the property); *Joseph J. Henderson & Son, Inc. v. Travelers Prop. Cas. Co. of Am.*, No. 16-cv-00048, 2018 WL 4701868, at *5-*7 (S.D. Iowa Jan. 23, 2018); (rejecting

*Daubert* challenges to experts' qualifications where meteorologist opined on wind conditions at a property during storm, and engineer opined on whether those wind conditions and/or defective workmanship could have caused the damage observed to the property's roof); *Arlington S. Hills, LLC v. Am. Ins. Co.*, 51 F. Supp. 3d 681, 689-90 (N.D. Tex. 2014) (rejecting *Daubert* challenges to experts' qualifications where meteorologist opined on size of the hail that fell on a property during three storms by extrapolating from measurements at nearby airports and weather stations, and engineer opined on whether the hail could have caused the damage observed to the roof); *Woodbury Lodging LLC v. Integrity Mut. Ins. Co.*, No. 20-cv-01015, 2022 WL 1004602, at *4-*6 (D. Minn. Apr. 4, 2022) (similar); *see also, e.g., Slocum v. Int'l Paper Co.*, No. 16-cv-12563, 2020 WL 1157863, at *3 (E.D. La. Mar. 10, 2020) (rejecting *Daubert* challenges to experts' qualifications where engineer opined on volume of "black liquor" that may have been released after a rupture in a paper factory's evaporator tank, and meteorologist opined on whether that volume could have diffused over a large geographic region such as to land on a property).

In view of the foregoing, the Court finds that the body of caselaw in this area does not support Defendant's contention that Peevey is qualified to offer expert testimony on windspeed and wind direction by virtue of her engineering background. Accordingly, the Court concludes that Defendant has not met its burden to prove by a preponderance of the evidence that Peevey is qualified to extrapolate windspeed or wind direction at the Mall from the NOAA data.

### B. Reliability of Peevey's Methodology

The Court also concludes that Peevey's methodology is unreliable. First, Peevey's windspeed and wind direction extrapolations are unreliable. Second, Peevey's calculations as to the force the hurricane exerted on the Mall—and her ultimate opinions in turn—are unreliable because they necessarily rely on Peevey's extrapolations.

**1. Reliability of Peevey's Windspeed and Wind Direction Extrapolations**

As previously explained, to calculate the force that the hurricane exerted upon the Mall and its relevant components, Peevey first extrapolated the windspeed and wind direction at the Mall from the NOAA data. She performed these extrapolations based on the theory that "hurricane wind speeds have been shown to decrease linearly with radial distance from the storm eye." (Dkt. No. 239-1 (Report) at 10 (citing *TREC Article*, at 653); *see also* Dkt. No. 244 (Peevey First Aff.) at ¶ 30 ("[B]y using the linear extrapolation method described in my Report as well as the historical data for wind direction, I was able to determine the wind conditions at the [Mall] during Hurricane Maria.")). Then, to calculate the wind direction at the Mall, Peevey employed fairly elementary trigonometry. (*See* Dkt. No. 244 (Peevey First Aff.) at ¶ 19).

Although "trained experts commonly extrapolate from existing data . . . nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). As such, the Court will apply the eight *Paoli II* factors to evaluate these facets of Peevey's methodology.

**a. Factors Weighing in Favor of Reliability**

Whether a theory or technique can be tested is "a key question to be answered in determining whether a theory or technique is scientific knowledge that will assist the trier of fact." *Daubert*, 509 U.S. at 593. Based on the Report and Peevey's testimony and affidavits, the Court understands how Peevey calculated the windspeed and wind direction at the Mall, as explained above. The Court finds that Peevey's method of linearly extrapolating windspeed from the NOAA data, and of calculating wind direction using trigonometry, are both testable, insofar as linear and trigonometric extrapolations may also be applied to other hurricanes and locations to determine

their accuracy and scientific validity. *See id.* (equating testability to falsifiability). Accordingly, this factor weighs in favor of admissibility.

### b. Factors Weighing Against Reliability

As a preliminary matter, the Court notes that the seventh *Paoli II* factor—the qualifications of the expert witness—weighs against admissibility as the Court has already found that Peevey is not qualified to calculate hurricane windspeed and wind direction. As such, Defendant's reliance on *St. Paul Fire and Marine Insurance Company v. Nolen Group Incorporated* is misplaced. (*See* Dkt. No. 243 (Def.'s Resp.) at 11 (citing No. 02-cv-08601, 2005 WL 1168380 (E.D. Pa. May 13, 2005))). In *St. Paul Fire*, the district court rejected a *Daubert* challenge to an expert who opined that water damage to a property was caused by Tropical Storms Allison and Floyd after concluding that the storms had deposited enough rain to cause a nearby drainage basin to overflow and flood the property. 2005 WL 1168380, at *5-*6. Defendant characterizes the case as one in which the court found an expert's testimony on weather phenomena admissible notwithstanding that the expert was "neither a meteorologist or an engineer" and had "model[led]" the rainfall to arrive at his conclusions. (Dkt. No. 243 (Def.'s Resp.) at 11-12). Defendant appears to contend that *St. Paul Fire* therefore stands for the proposition that experts who are not meteorologists may reliably undertake weather calculations. *Id.* However, while not a meteorologist, the expert in *St. Paul Fire* was a "hydrology expert" who was qualified to opine on rainfall by virtue of his relevant doctorate and training. 2005 WL 1168380, at *5. As such, the court had determined—prior to evaluating the reliability of his methodology—that he was qualified to undertake the analyses that he performed. *Id.* at *5. Conversely, no evidence has been presented here that Peevey has been trained to calculate hurricane windspeed or wind direction, and the Court has already determined that Peevey is not appropriately qualified.

Defendant also contends that Peevey's reliance on the TREC Article demonstrates that her method has been validated by peer review. (Dkt. No. 243 (Def.'s Resp.) at 13). This argument is similarly unavailing, for two reasons. First, Peevey explicitly stated that the methodology of the TREC Article is not her methodology, but rather that she relied on the article solely to support the proposition that windspeed varies inversely with radial distance from a hurricane's eye. (*See* Dkt. No. 244 (Peevey First Aff.) at ¶ 18 ("the [TREC Article] . . . is not the 'methodology' utilized in my analysis, but supports the linear extrapolation of the weather data that I used for the Mall, by demonstrating hurricane wind speeds decrease linearly with radial distance from the storm eye.")).

Second, the TREC Article itself does not purport to validate the theory that windspeed varies inversely with radial distance from a hurricane's eye. *See TREC Article,* at 653 (noting the primary purpose of the article is to evaluate a "method for determining horizontal wind speeds in hurricanes using ground-based radars"—radars that were not utilized by Peevey). In fact, the TREC Article—the only authority upon which Peevey relies to establish the validity of her method of linear extrapolation—*directly contradicts* the theory that windspeed decreases linearly with distance. At no point does the article itself refer to windspeed patterns as linear. *See TREC Article*, at 653-668. Nor does the figure upon which Peevey relies or the accompanying discussion purport to show or demonstrate that windspeed decreases linearly with radial distance. *Id.* at 658. Rather, it shows that windspeed generally increases until a point approximately twenty to thirty kilometers from the eye and then decreases. *Id.* 658. Further, it shows that neither the initial increase nor the subsequent decrease is uniform—that is, windspeed may locally decrease over the first twenty to thirty kilometers and may also locally increase after crossing that threshold. *Id.*

In summary then, the only support provided for Peevey's linear extrapolation methodology for windspeed is one article, and that article does not support the methodology. In the absence of any further support provided by Defendant for Peevey's windspeed extrapolation, the Court can

only conclude that Defendant has failed to demonstrate that Peevey's methodology has been subjected to peer review, or that it passes muster under any of the other *Paoli II* factors—that it has an acceptable error rate, that it is controlled by established standards, that it is generally accepted by meteorologists or any other relevant scientific community, that it bears a significant relationship to reliable methods, or that it is utilized in non-judicial settings. *See In re TMI Litig.*, 193 F.3d at 663 (the party offering the expert bears the burden of demonstrating the reliability of the expert's methodology); *see also Williams v. Rene*, 72 F.3d 1096, 1101-03 (3d Cir.1995) (reversing admission of expert testimony where, despite significant detail, underlying assumption was "unsupported and speculative").

Likewise, while the trigonometry Peevey applied to calculate the wind direction at the Mall appears straightforward, Defendant has offered no authority to support that these extrapolations should in fact be as straightforward as they appear. That is, Defendant has failed to offer any authority for the proposition that wind direction may or should be calculated by simply taking the tangent of a hurricane's eyewall, nor has it offered any evidence to suggest that meteorologists do so as a matter of course or that doing so is a complication-free endeavor. As such, the same *Paoli II* factors that weigh against Peevey's windspeed extrapolations also weigh against her wind direction extrapolations.

In view of the foregoing—one *Paoli II* factor weighing in favor of admissibility and seven factors weighing against—the Court finds that Defendant has failed to carry its burden to prove by a preponderance of the evidence that Peevey's calculations of windspeed and wind direction are reliable.

### 2. Reliability of Peevey's Force Calculations and Conclusions

"*Daubert*'s requirement that the expert testify to scientific knowledge—conclusions supported by good grounds for each step in the analysis—means that any step that renders the

analysis unreliable under the *Daubert* factors renders the expert's testimony inadmissible." *Paoli II*, 35 F.3d at 745; *accord Knight v. Kirby Inland Marine, Inc.*, 482 F.3d 347, 355 (5th Cir. 2007) ("Expert's testimony must be reliable at each and every step or else it is inadmissible."). However, "*Daubert* is not an all-or-nothing test . . . a District Court can independently consider whether each 'particular scientific methodology is reliable.'" *Dewey v. Volkswagen Aktiengesellschaft*, 681 F.3d 170 (3d Cir. 2012) (quoting *Elcock v. Kmart Corp.*, 233 F.3d 734, 745 (3d Cir. 2000). Here, the Court finds that, in addition to the unreliability of Peevey's windspeed and wind direction calculations, Peevey's force calculations—and in turn her ultimate opinions—are also unreliable as they necessarily rely on the unreliable windspeed and wind direction extrapolations. Thus, Peevey has no testimony to offer that is not unreliable by virtue of this reliance.

Defendant does not dispute that Peevey's force calculations are based upon her windspeed and wind direction extrapolations. (*See, e.g.,* Dkt. No. 278 (Def. Resp.) at 4 ("*All* of Peevey's modelling regarding the weather condition experienced at the [Mall] was generated using [the extrapolations she made based upon] the extensive available recorded information [as to windspeed and wind direction]." (emphasis added) (quotation omitted)); Dkt. No. 244 (Peevey First Aff.) at ¶ 19 ("Using the linear extrapolation method described in my report as well as the historical data for wind direction, I was able to determine the wind condition at the Mall during Hurricane Maria[.]")). Instead, Defendant appears to rely on *Marmo v. IBP Incorporated* for the proposition that any deficiencies in Peevey's extrapolations go only to the weight and not to the admissibility of Peevey's testimony. (Dkt. No. 278 (Def. Resp.) at 10-11 (citing No. 00-cv-00527, 2005 WL 675810 (D. Neb. Feb. 4, 2005))).

Defendant's reliance on *Marmo* is misplaced. In *Marmo*, the district court found that, while one of the plaintiff's proffered experts may have made some "mathematical mistakes" in his analysis, and while "there is some question about the source of meteorological data" upon which

another of the plaintiff's experts relied, the defendant's concerns that these experts' opinions were "premised on erroneous calculations or inaccurate factual information" were concerns best addressed through "cross-examination and not the exclusion of evidence." *Marmo*, 2005 WL 675810, at \*2. Here—unlike in *Marmo*—the Court has not found that the NOAA data upon which Peevey relied was suspect or that she made "mathematical" errors while performing her extrapolations. Rather, the Court has determined that the process through which Peevey arrived at her extrapolated figures is unreliable because she lacked a reliable basis to perform the calculations in the manner that she performed them. Moreover, the errors that the *Marmo* experts allegedly made appear to have been relatively minor in that there is no suggestion that these errors undermined the experts' testimonies *in toto*. *Id.* Here, however, Peevey's windspeed and wind direction extrapolations are essential to her force calculations and ultimately *determine* her conclusions.

That this is so is highlighted by the fact that nowhere in Peevey's 58-page Report or two supporting affidavits does she suggest that, based on her expertise, her force calculations would have been accurate or reliable had she *not* utilized the extrapolated windspeed and wind direction data that she generated. Indeed, in her deposition testimony, Peevey acknowledged that she could not have reached the conclusions that she did had she not extrapolated the windspeed and wind direction herself and instead simply utilized the non-extrapolated NOAA data from Sandy Point. (*See* Dkt. No. 275-1 (Peevey Second Dep. Tr. Excerpts) at 18:23-19:7 ("We utilized the Sandy Point information and determined that it *did not explain*—did not result in pressures that exceeded the roof deck capacity" (emphasis added)); *id.* at 77:12-19 ("[The non-extrapolated windspeed] didn't produce the same result. It doesn't explain the actual roof deck failure.")). And Defendant argues accordingly that "[a]rmed with this [extrapolated] knowledge of wind speed and wind direction, Peevey was *then* able to determine the impact of the wind on the various [Mall]

components (specifically to better understand the storm pressures exerted on the building components that failed)." (Dkt. No. 278 (Def. Supp. Resp.) at 4 (emphasis added)).

In view of the foregoing, the Court finds that Peevey's force calculations—and in turn her ultimate opinions—are unreliable by virtue of their reliance on the windspeed and wind direction extrapolations that the Court has already determined are unreliable.

## IV.    CONCLUSION

For the foregoing reasons, the Court finds that Defendant has failed to carry its burden to show by a preponderance of the evidence that Peevey is qualified to offer her proposed testimony and that the methodology through which she reached her opinions is reliable. Both failures provide independent grounds to exclude her testimony. Accordingly, the Court will grant Plaintiffs' *Daubert* Motions and exclude Peevey's testimony.

An appropriate Order accompanies this Memorandum Opinion.

Date:   September 30, 2022                           _____/s/_____
                                                     WILMA A. LEWIS
                                                     District Judge